IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

OLACHI MEZU-NDUBUISI,

               Plaintiff,

    v.

                                   OPINION and ORDER

BD. OF REGENTS OF THE UNIV. OF WIS. SYS.,
ROBERT GOLDEN, ELLEN WALD, RYAN               24-cv-31-jdp
MCADAMS, and UNITYPOINT HEALTH–MERITER
HOSPITAL,

               Defendants.

Plaintiff Dr. Olachi Mezu-Ndubuisi, a black American woman of Nigerian national origin, was employed as a physician-scientist at the University of Wisconsin School of Medicine and Public Health. She had practice privileges both at UW Hospital and at UnityPoint Health-Meriter Hospital. She alleges that UW Hospital, Meriter, and employees of those institutions mistreated her because they regarded her as disabled, retaliated against her for using medical leave for herself, and interfered with her ability to use medical leave for her daughter. Mezu-Ndubuisi is proceeding on a disability discrimination claim under the Rehabilitation Act, and on retaliation and interference claims under the Family Medical Leave Act (FMLA).

The UW Hospital and Meriter defendants separately move for summary judgment. Dkt. 144 and Dkt. 164. Regarding disability discrimination, the undisputed facts show that defendants did not regard Mezu-Ndubuisi as disabled or restrict her clinical practice because of a prior brain aneurysm that she had suffered. The restrictions resulted from, among other nondiscriminatory reasons, a serious incident in which she jeopardized patient safety and concerning statements that she made during the ensuing investigations. The FMLA retaliation

claim fails for substantially the same reasons. The investigations, restrictions, and other employment actions that Mezu-Ndubuisi challenges were based on patient safety concerns and other nonretaliatory reasons. Regarding FMLA interference, Mezu-Ndubuisi's initial request for leave was timely approved. There was a one-day delay before a later request for an extension was approved, but that minor delay was not prejudicial. Mezu-Ndubuisi's other theories of FMLA interference are contradicted by the undisputed facts. The court will grant summary judgment to defendants and close the case.

## UNDISPUTED FACTS

The court begins with a word about Mezu-Ndubuisi's summary judgment opposition. On summary judgment, this court requires the moving party, here defendants, to set out a statement of proposed facts with citations to admissible supporting evidence. *See* attachment to Dkt. 50 at 2–4. The party opposing the motion, here Mezu-Ndubuisi, must state whether each fact is disputed, and if it is, support the opposition with a citation to admissible evidence. *Id.* at 4–5. All litigants must comply with the court's orders and rules. *See Allen-Noll v. Madison Area Tech. Coll.*, 969 F.3d 343, 349 (7th Cir. 2020).

Admissible evidence may include declarations *See* attachment to Dkt. 50 at 3–4. A proposed fact supported with a declaration must include the page and paragraph number. *Id.* at 4. The court will not search the record for evidence. *Id.* at 3–4. These procedures aim to help the court identify the evidentiary support for the parties' proposed facts and to determine if those facts are genuinely disputed. *Id.* at 3; *see also* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to *particular* parts of materials in the record . . . ." (emphasis added)); *Winters v. Fru-Con Inc.*, 498

F.3d 734, 744 (7th Cir. 2007) ("In considering a motion for summary judgment, the district court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies."). Mezu-Ndubuisi was cautioned that if her response to a proposed fact relied on inadmissible evidence or otherwise did not comply with the court's procedures, the court would take the opposing party's factual statement as true and undisputed. *See* attachment to Dkt. 50 at 8.

Mezu-Ndubuisi's responses to defendants' proposed findings of fact do not comply with the court's summary judgment procedures or Rule 56(c). *See* Dkt. 180 and Dkt. 181. There are several shortcomings, but in particular Mezu-Ndubuisi supports nearly all of her disputes by citing multipage sections of a 141-page document that she calls a declaration. *See* Dkt. 183. To complicate matters, the declaration is not limited to factual statements based on Mezu-Ndubuisi's personal knowledge that would be admissible in evidence, as required by Rule 56(c)(4) and Federal Rule of Evidence 602. *See Foster v. PNC Bank, Nat'l Ass'n*, 52 F.4th 315, 320 (7th Cir. 2022). Rather, the declaration includes statements lacking foundation, immaterial information, and improper argument. *See* Dkt. 183; *see also* Dkt. 191 at 2–3 (discussing some of the declaration's deficiencies). The declaration also incorporates long sections from, or even entire, documents, along with hours of audio recordings. Many of Mezu-Ndubuisi's own proposed facts are similarly deficient. *See* Dkt. 182.

Mezu-Ndubuisi has failed to clearly identify the evidence supporting her side of purported factual disputes, and she relies often on inadmissible evidence. At bottom, Mezu-Ndubuisi asks the court to scour her excessively long and argumentative declaration and scrutinize lengthy audio recordings to determine whether there is admissible evidence to put

defendants' proposed facts into genuine dispute. The court declines to take on this onerous task, partly because doing so would compromise its role as a neutral decisionmaker. *See Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) ("[A] district court is not required to scour the record looking for factual disputes, [or] scour the party's various submissions to piece together appropriate arguments. A court need not make the lawyer's case."). The court will accept defendants' properly supported proposed facts as undisputed. *See Allen-Noll*, 969 F.3d at 349; *Hedrich v. Bd. of Regents of Univ. of Wisconsin Sys.*, 274 F.3d 1174, 1177–78 (7th Cir. 2001).

With that background, the following facts are undisputed.

## A. Start of employment and medical background

In 2013, Mezu-Ndubuisi started working for UW Hospital as a neonatologist, and she performed both research and clinical work. The individual defendants also worked at UW Hospital. Defendant Dr. Ellen Wald was the chair of the Department of Pediatrics, and defendant Dr. Ryan McAdams was the division chief. Wald and McAdams supervised Mezu-Ndubuisi. Defendant Dr. Robert Golden was the dean and vice chancellor for medical affairs.

Mezu-Ndubuisi also had clinical privileges at Meriter, where she was a medical staff member assigned to care for infants in the Neonatal Intensive Care Unit (NICU). Dr. Nina Menda was the NICU's medical director.

In 2009, Mezu-Ndubuisi had suffered a brain aneurysm but fully recovered after two months. Later, during credentialing, Mezu-Ndubuisi disclosed that medical history, but only to explain a gap in her educational training. Dkt. 187 ¶¶ 187–88. No medical staff perceived Mezu-Ndubuisi as disabled or had any other questions or concerns. *See id.* ¶¶ 187–89.

In 2015, Mezu-Ndubuisi told Menda that Mezu-Ndubuisi had given birth to a premature child that died. Dkt. 149 at 16. Mezu-Ndubuisi also discussed this medical history with McAdams. Dkt. 158 at 48–49.

## B. Meriter's bylaws and rules and regulations

Meriter medical staff are subject to a set of bylaws and rules and regulations, which the court refers to collectively as the bylaws. Dkt. 169-2; Dkt. 169-3. The bylaws, among other requirements, prohibit medical staff from engaging in conduct that is inconsistent with or harmful to the appropriate care or safety of any patient or to other patient-related standards or goals, and conduct that is disruptive to hospital operations. Dkt. 190 ¶ 12. More specifically, medical staff must be free of any significant active physical, mental, or behavioral impairment that presents a substantial probability of interfering with patient care. *Id.* ¶ 34. And on-call providers must answer pages from the emergency room within five minutes, all other pages within 15 minutes, and arrive at Meriter within 30 minutes of receiving an emergency call. *Id.* ¶ 36.

## C. Review of Mezu-Ndubuisi's clinical practice

On July 23, 2020, Mezu-Ndubuisi became the subject of a Focused Professional Practice Evaluation (FPPE), which is a nonpunitive performance improvement plan initiated when a physician has three peer-reviewed cases in 12 months. *Id.* ¶¶ 24–25. The goals of Mezu-Ndubuisi's FPPE were compliance with clinical guidelines and improved communication. *Id.* ¶ 27.

On October 24, 2020, a newborn infant experienced a collapsed lung and needed an emergency procedure. *Id.* ¶ 16. That evening, Mezu-Ndubuisi was the on-call physician for the NICU. *Id.* ¶ 17. Meriter tried calling and paging Mezu-Ndubuisi, but she did not respond for

one hour and thirty-eight minutes. *Id.* ¶¶ 18–19. When Mezu-Ndubuisi ultimately arrived at Meriter, she spoke with Menda over the telephone. Dkt. 158 at 18. Menda asked Mezu-Ndubuisi what happened, and Mezu-Ndubuisi responded that she was "unwell" or "not feeling well." *Id.*

The next day, Menda informed Mezu-Ndubuisi that the incident was a serious patient safety event and that the matter would be referred to Meriter's maternal-child peer review committee (MPRC). Dkt. 190 ¶ 21. Menda told Mezu-Ndubuisi that Meriter's policy required ill physicians to call for backup through the "Flex attending" system. Dkt. 190 ¶ 22. Mezu-Ndubuisi responded that she couldn't activate that system because she had become "emergently ill" due to a "medical emergency beyond [her] control." Dkt. 158-3 at 23–25. Around that time, Menda received a written complaint from the hospital chaplain. Dkt. 158-6. The chaplain reported that Mezu-Ndubuisi had acted in an odd and inappropriate manner while informing grieving parents that their child had died. *See id.*

On October 27, 2020, Mezu-Ndubuisi went to her primary care physician, Dr. Amy Forthergill, for consultation. Fothergill's report says that, while on call, Mezu-Ndubuisi had a headache and "[t]ook [T]ylenol and [did] not remember the next 2 hours," and that Mezu-Ndubuisi was "[u]nsure if she fell asleep." Dkt. 158-11 at 1. The report also says that Mezu-Ndubuisi had previously experienced a brain aneurysm and that if her headaches persisted imaging would be appropriate. *Id.* at 2.

Around that time, Mezu-Ndubuisi requested medical leave from her clinical duties under the FMLA based on a serious health condition. *See* Dkt. 187 ¶¶ 79, 92. The employee relations coordinator in UW Hospital's human resources department, Pa Nhia Lee Chentnik, processed Mezu-Ndubuisi's FMLA request. *Id.* ¶¶ 24–26. The human resources department

approved the request from October 27 to November 27, 2020. *Id.* ¶¶ 85–86. When the human resources department determines that an employee meets the requirements for FMLA leave, it approves the leave on its own; the human resources department is not required to obtain approval from another department or an employee's supervisors. *Id.* ¶ 83. Mezu-Ndubuisi did not perform clinical work while on leave. *Id.* ¶ 80. On November 20, 2020, Mezu-Ndubuisi's doctor cleared her to return to work with no restrictions.

The MPRC was tasked with reviewing Mezu-Ndubuisi's delayed response on October 24. Dkt. 190 ¶ 38. The review was "blind," meaning that its members were unaware of Mezu-Ndubuisi's identity to avoid potential bias. *Id.* On November 20, 2020, the MPRC met and, with the approval of Meriter's chief medical officer, Dr. Pam Wetzel, referred the matter to another blind committee, the Maternal-Child Peer Review Committee, which Meriter refers to as the MPROC. *Id.* ¶ 39. The MPROC determined that the incident warranted further investigation and that there were sufficient grounds to investigate corrective action under the bylaws. *Id.* ¶ 40; Dkt. 165-1 at 5–6.

The MPROC appointed an ad hoc committee to investigate the incident. Dkt. 190 ¶ 43. In mid-December 2020, Meriter's president of medical staff, Dr. Newrhee Kim, notified Mezu-Ndubuisi that the ad hoc committee had been appointed to review the FPPE, the delayed response, and the chaplain's complaint. *Id.* ¶ 44.

The ad hoc committee interviewed witnesses, including Mezu-Ndubuisi, who was interviewed in early January 2021. *Id.* ¶¶ 45–46. Mezu-Ndubuisi said that she had experienced a medical emergency but refused to clearly explain it, and she failed to identify appropriate steps to address the possibility of a reoccurrence. *See id.* ¶¶ 46–51. Later that month, the ad hoc committee advised Mezu-Ndubuisi that she would have to provide a comprehensive mental

and physical assessment from Vanderbilt University Medical Center or a comparable facility. *Id.* ¶ 52. The committee explained that the testing was necessary for Mezu-Ndubuisi to show that she could meet her obligation to be mentally and physically capable of providing appropriate patient care, and to otherwise comply with Meriter's bylaws. *Id.* ¶ 53.

On February 8, 2021, Mezu-Ndubuisi wrote the committee to dispute the need for a Vanderbilt assessment. *See* Dkt. 158-3. Mezu-Ndubuisi was less clear about whether she had experienced a medical emergency on October 24, 2020, writing that she "believed" the situation to be a medical emergency. *See id.* at 3; Dkt. 165-1 at 11. Mezu-Ndubuisi also wrote that she had a "severe stress reaction to racial discrimination" and that, as a result, she "slept off." *See* Dkt. 158-3 at 6; Dkt. 165-1 at 12. Mezu-Ndubuisi added that she felt well after taking FMLA leave, and that the request for Vanderbilt testing was racially motivated and retaliatory. *See* Dkt. 190 ¶ 57.

In early June 2021, Mezu-Ndubuisi completed the Vanderbilt assessment, during which she voluntarily disclosed her medical history. Dkt. 187 ¶ 201. Mezu-Ndubuisi's 2009 brain aneurysm was considered only because Fothergill's report raised the possibility that it could have contributed to the October 24 incident. *See id.* ¶ 202.

According to the Vanderbilt assessment: (1) there never was a medical emergency; Mezu-Ndubuisi likely made up the story because she was ashamed; and (2) Mezu-Ndubuisi was mentally and physically capable of performing her clinical duties, assuming she complied with certain recommendations. Dkt. 190 ¶ 59; Dkt. 166-3 at 2–3.

Later in June 2021, the ad hoc committee noted that Mezu-Ndubuisi had offered several inconsistent explanations for the October 24 incident. *See* Dkt. 190 ¶ 60; Dkt. 166-3 at 2. Ultimately, the ad hoc committee recommended to Meriter's medical executive committee

that Mezu-Ndubuisi be reinstated for one year—initially with clinical privileges, but with a plan for re-entering clinical care that included monitoring. Dkt. 190 ¶ 61; Dkt. 166-3 at 5–7.

The medical executive committee adopted the ad hoc committee's recommendations, but with certain modifications to the reintroduction plan. Dkt. 190 ¶ 62. On June 30, 2021, those recommendations were approved by Kim and Meriter's board of directors. *Id.* ¶ 64; Dkt. 166-4. Specifically, the board directed the credentials committee to oversee a reintroduction plan that included, at a minimum: (1) retrospective chart review and review of other relevant documentation, including incident reports, by McAdams; (2) Mezu-Ndubuisi's shadowing of a physician to observe interpersonal communications during rounds and receipt of feedback for two weeks; (3) weekly check-ins with McAdams or his designee; (4) attendance of at least 80 percent of NICU meetings; (5) tracking any untimely responses to calls; (6) monthly check-ins with a mentor in the NICU; (7) receiving counseling; and (8) attending an online course for distressed physicians. Dkt. 166-4 at 2–3.

## D. Second request for FMLA leave

On August 4, 2021, Mezu-Ndubuisi requested FMLA leave to care for her daughter. Dkt. 187 ¶ 95. Specifically, Mezu-Ndubuisi requested leave from clinical work, which she said comprised 50 percent of her workload. *Id.* Mezu-Ndubuisi's medical documentation stated that she could continue her research work. *Id.* The human resources department approved Mezu-Ndubuisi's request on August 11, 2021, five business days after she submitted the required documentation. *Id.* ¶ 97; Dkt. 154-3.

Mezu-Ndubuisi's FMLA leave was initially approved until November 3, 2021. Dkt. 187 ¶ 99. For reasons not relevant here, the human resources department later extended it to April 29, 2022. *Id.* ¶¶ 100–03.

In late January 2022, Brittney Quam, a leave specialist in the department of human resources, notified Wald and McAdams of the latest extension. Wald then informed Quam that Mezu-Ndubuisi wasn't responding to "simple inquires and missives," and Wald asked Quam how Mezu-Ndubuisi could perform research while traveling to a facility three hours from Madison to care for her daughter. *Id.* ¶ 104; Dkt. 154-8. Quam responded that she didn't handle work performance issues and she advised Wald to contact another human resources department professional. Dkt. 187 ¶ 105.

On April 21, 2022, Mezu-Ndubuisi requested an extension of FMLA leave until July 22, 2022. *Id.* ¶ 106. On April 26, 2022, Chentnik informed Wald and McAdams that Mezu-Ndubuisi was entitled to FMLA leave until June 20, 2022, but that any leave beyond then was within the discretion of the Department of Pediatrics. *Id.*

That day, Chentnik was contacted by Wald and Julene Gaspard, the chief administrative officer for the Department of Pediatrics. *Id.* ¶¶ 108–09. Chentnik understood Wald and Gaspard to be concerned about discretionary leave, and she told them that the human resources department would approve leave until June 20 if there were no concerns about that request. Dkt. 154-10 at 1. Two days later, Chentnik sent a follow-up email to Wald, Gaspard, and McAdams. Dkt. 187 ¶ 111. Chentnik wrote that she needed confirmation that there was work for Mezu-Ndubuisi to do even though Mezu-Ndubuisi sought to continue with no clinical duties. *See id.*; Dkt. 154-11 at 1.

The same day, Gaspard responded that she wanted to verify Mezu-Ndubuisi's leave balances with payroll because Mezu-Ndubuisi had not submitted her leave usage since February 28, 2022. *Id.* A UW Hospital employee may use accrued paid leave to remain in paid status and continue to receive normal pay while on FMLA leave. Dkt. 187 ¶ 113. An employee is

10

expected to submit her accrued leave usage so that the Department of Pediatrics knows how much paid leave time she has to use while on FMLA leave. *Id.* Gaspard added that if Mezu-Ndubuisi had enough leave to carry her through the end of June and Wald and McAdams agreed, Gaspard would be comfortable approving the extension until June 20, 2022. Dkt. 154-11 at 1.

Payroll can verify an employee's paid leave balances for the Department of Pediatrics if the employee has failed to submit her leave use. Dkt. 187 ¶ 113. The next day, Chentnik notified Mezu-Ndubuisi that the human resources department had approved her FMLA extension until June 20, 2022. Dkt. 187 ¶ 114; Dkt. 154-12. The approval came six business days after Mezu-Ndubuisi's request for an extension; Mezu-Ndubuisi's FMLA leave had not yet expired. *Id.* ¶ 208. In late May 2022, Chentnik sent Mezu-Ndubuisi a revised memo stating that her FMLA leave had been approved until July 22, 2022. Dkt. 187 ¶ 115; Dkt. 152-13.

**E.  Compensation while on FMLA leave**

In fiscal year 2022, Mezu-Ndubuisi was scheduled to receive a total target compensation of $286,972, $140,209 of which was base salary paid by UW Hospital. *See* Dkt. 187 ¶¶ 166, 171–72. Part of Mezu-Ndubuisi's total compensation came from the UW Medical Foundation for being a credentialed clinician with patient care activities. *See id.* ¶ 167. Physicians may receive base compensation while on FMLA leave by using accrued vacation, personal holiday, and sick leave balances to cover their FMLA leave. *Id.* ¶ 168.

Starting in fiscal year 2022, part of Mezu-Ndubuisi's base salary was funded by a federal grant that she received in September 2021. *Id.* ¶ 171. After Mezu-Ndubuisi received this grant, her base salary increased and her UW Medical Foundation compensation decreased to maintain the total target compensation of $286,972. *Id.* ¶ 173. Under the terms of her

compensation agreement, Mezu-Ndubuisi had to perform eight weeks of clinical duties to receive her full compensation for fiscal year 2022. *Id.* ¶ 174.

In April 2022, Gaspard learned that Mezu-Ndubuisi hadn't completed any of her expected eight weeks of clinical duties in 2022. *Id.* ¶ 175. Gaspard knew that Mezu-Ndubuisi was on 50 percent FMLA leave until April 30, 2022, and Gaspard confirmed that Mezu-Ndubuisi could not meet the eight-week requirement by the end of the fiscal year on June 30, 2022. *Id.* ¶ 176. Gaspard notified Mezu-Ndubuisi's that the UW Medical Foundation part of her compensation would be reduced under the terms of her compensation agreement. *Id.* ¶¶ 176–77. It was standard practice for the Department of Pediatrics to withhold 6.6 percent from physicians' total compensation if they didn't meet UW Medical Foundation compensation requirements. *Id.* ¶ 178.

In mid-May, Mezu-Ndubuisi submitted her resignation to Wald, which the Department of Pediatrics accepted. *Id.* ¶ 162. Mezu-Ndubuisi stopped working at UW Hospital on June 30, 2022.

The court will discuss additional facts as they become relevant to the analysis.

## ANALYSIS

### A. Rehabilitation Act claim

In her amended complaint, Mezu-Ndubuisi alleges that she was regarded as disabled based on her: (1) 2009 brain aneurysm; and (2) mental health issues related to giving birth to a premature infant who died. *See* Dkt. 95 at 10 (court's description of Mezu-Ndubuisi's claims). Mezu-Ndubuisi also alleges that she was subjected to unfounded patient safety reports, unwarranted Vanderbilt testing, excessive monitoring, and the wrongful denial of clinical

privileges even though her work performance was outstanding and she successfully completed the Vanderbilt testing. *See id.*

In her briefs in opposition, which are identical, Mezu-Ndubuisi, presses mostly the same claims. *See* Dkt. 178 at 6, 9, 13–14. But Mezu-Ndubuisi no longer contends that defendants regarded her as disabled because she had mental health issues related to the death of her premature infant, so she has forfeited this point. *See Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) ("[A]s the district court found, the . . . argument was forfeited because it was perfunctory and underdeveloped."); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

To prevail on her Rehabilitation Act claim, at a minimum, Mezu-Ndubuisi must show that defendants regarded her as having an impairment that substantially limited her ability to perform a major life activity, and that this perception caused an adverse employment decision. *See Richardson v. Chicago Transit Auth.*, 926 F.3d 881, 886 (7th Cir. 2019); *Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1173 (7th Cir. 2013); *Kurowski v. Shinseki*, 557 F. App'x 549, 553 (7th Cir. 2014); *see also Vargas v. DeJoy*, 980 F.3d 1184, 1188 n.4 (7th Cir. 2020) ("[Courts] resolve Rehabilitation Act claims by looking to the same standards and provisions that govern the Americans with Disabilities Act."). As relevant here, major life activities include working. *Carothers v. Cnty. of Cook*, 808 F.3d 1140, 1147 (7th Cir. 2015).

In ruling on defendants' motions to dismiss, the court took Mezu-Ndubuisi to allege that defendants regarded her brain aneurysm as substantially limiting only her ability to work. *See* Dkt. 95 at 10. Mezu-Ndubuisi hasn't challenged this interpretation or argued in her brief in opposition that defendants regarded her brain aneurysm as substantially limiting any other

13

major life activity. So the court will analyze whether Mezu-Ndubuisi has shown that defendants regarded her brain aneurysm as substantially limiting her ability to work.

Mezu-Ndubuisi has not provided any specific citation to admissible evidence supporting a reasonable finding that defendants regarded her brain aneurysm as limiting her ability to work, and the undisputed facts show otherwise. Mezu-Ndubuisi was hired as a neonatologist and scientific researcher and had clinical privileges at UW Hospital and Meriter for years even though she disclosed her brain aneurysm during credentialing. There is no evidence that medical staff perceived Mezu-Ndubuisi as disabled or had any other questions or concerns because she had suffered a brain aneurysm in 2009.

Mezu-Ndubuisi contends that she was subjected to unfounded patient safety reports, unwarranted Vanderbilt testing, excessive monitoring, and the wrongful denial of clinical privileges based in part on her brain aneurysm. Mezu-Ndubuisi hasn't cited admissible evidence showing that the patient safety reports that led to the FPPE were submitted by hospital staff who knew about her brain aneurysm. But, even if the reporting staff had known about the aneurysm, Mezu-Ndubuisi hasn't identified any evidence that her brain aneurysm caused those complaints. *See Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024) ("[S]peculation is insufficient to defeat a summary judgment motion.").

To the contrary, the undisputed facts show that the Vanderbilt assessment and restrictions on Mezu-Ndubuisi's clinical practice resulted from the October 24 incident and ensuing investigations, not concerns about Mezu-Ndubuisi's brain aneurysm. The October 24 incident was a serious matter that warranted investigation and remediation. A newborn infant had a collapsed lung and needed an emergency procedure. Mezu-Ndubuisi, as the on-call physician, was required to promptly answer emergency pages and calls, but she did not respond

14

for more than an hour and a half. During the investigations, Mezu-Ndubuisi provided varying explanations for her conduct that raised serious concerns about her ability to care for patients. As a neonatologist in the NICU, Mezu-Ndubuisi worked with highly vulnerable infants. The investigation was referred to the ad hoc committee, but only after review by two blind committees. Mezu-Ndubuisi told the ad hoc committee that she had experienced a medical emergency but refused to provide a clear explanation for it, and she failed to identify appropriate steps to address the cause of the medical emergency. The ad hoc committee's decision to require a Vanderbilt assessment was amply justified and does not support any inference of disability discrimination. *Cf. Fuller v. McDonough*, 84 F.4th 686, 690 (7th Cir. 2023) ("[J]ob-related criticism can prompt an employee to improve her performance and thus lead to a new and more constructive employment relationship."). No admissible evidence suggests that concerns about Mezu-Ndubuisi's brain aneurysm influenced that decision.

Mezu-Ndubuisi's brain aneurysm was considered during the Vanderbilt assessment, but only because she voluntarily disclosed her medical history. Mezu-Ndubuisi's own primary care provider, Fothergill, raised the possibility that the brain aneurysm could have contributed to the October 24 incident. Mezu-Ndubuisi agreed that it was appropriate for Fothergill and the Vanderbilt evaluators to consider whether her brain aneurysm contributed to the October 24 incident. Dkt. 187 ¶¶ 203–04. And the evaluators found that Mezu-Ndubuisi did not have a medical condition that would preclude her from resuming her clinical practice, Dkt. 166-3 at 3. That finding doesn't suggest that defendants regarded Mezu-Ndubuisi's brain aneurysm as restricting her ability to work.

The board of directors ultimately allowed Mezu-Ndubuisi to return to clinical practice if she complied with a reintroduction plan. But, like the prior investigations, there's no

admissible evidence that the board required the reintroduction plan because of Mezu-Ndubuisi's brain aneurysm. Mezu-Ndubuisi says that the reintroduction plan was unwarranted and stigmatizing because the Vanderbilt evaluators found that she did not have "any medical, psychiatric, addiction, cognitive or other disorder that would preclude her from safely resuming patient care duties at Meriter." *Id.*; Dkt. 178 at 7, 12–14. There's nothing stigmatizing in that finding. The evaluators recommended that Mezu-Ndubuisi should pursue counseling and that it would benefit her to attend all NICU meetings, and those activities were part of the reintroduction plan. The board's decision to require the reintroduction plan was based substantially on Mezu-Ndubuisi's absence "from clinical practice for a number of months." *See* Dkt. 166-4 at 1. No reasonable juror could conclude that defendants regarded Mezu-Ndubuisi's brain aneurysm as substantially restricting her ability to perform her clinical duties.

For substantially the same reasons, even if Mezu-Ndubuisi could show that defendants regarded her as disabled, no reasonable juror could conclude that this perception caused them to take the employment actions that she challenges. Again, there's no evidence that any of Mezu-Ndubuisi's colleagues had any concerns about her prior brain aneurysm that led them to make the complaints that led to the FPPE. The undisputed facts compel the conclusion that the investigations into Mezu-Ndubuisi's clinical practice and ultimate recommendation for a reintroduction plan resulted from: the October 24 incident; Mezu-Ndubuisi's concerning and conflicting explanations for that incident; the recommendations of evaluators (many of whom were blind or independent); Mezu-Ndubuisi's extended absence from clinical practice; and an overarching need to ensure the safety of a vulnerable population: premature infants. The court will grant summary judgment to defendants on Mezu-Ndubuisi's Rehabilitation Act claim.

**B. FMLA claims**

**1. Retaliation claim**

Mezu-Ndubuisi alleges that defendants retaliated against her because she took FMLA leave for herself on October 27, 2020. *See* Dkt. 95 at 11–12. Mezu-Ndubuisi also alleges that the retaliatory actions are the same adverse actions that defendants took because they regarded her as disabled. *See id.* at 10, 12. Or as Mezu-Ndubuisi's explains, the "alpha and omega of . . . [the] retaliation claim is that [defendants] used her 30-day medical leave . . . as a pretext for her *de facto* permanent expulsion from clinical work in the NICU." Dkt. 178 at 10–11 (emphasis in original).

To prevail on an FMLA retaliation claim, Mezu-Ndubuisi must show that: (1) she engaged in statutorily protected activity; (2) her employer took adverse action against her; and (3) the protected activity caused the adverse action. *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1307 (7th Cir. 2022). Regarding the third element, causation, Mezu-Ndubuisi need show only that "the protected conduct was a substantial or motivating factor in the employer's decision." *Id.*

Mezu-Ndubuisi engaged in statutorily protected activity by using FMLA leave, and the court will assume for purposes of this opinion that the employment actions that she challenges were adverse. *See id.* Thus, the issue is whether Mezu-Ndubuisi has shown that her decision to use FMLA leave for herself was a substantial or motivating factor in those actions. *See id.*

Mezu-Ndubuisi hasn't made this showing. In granting summary to defendants on Mezu-Ndubuisi's Rehabilitation Act claim, the court explained how the evidence compels the conclusion that the restrictions to her clinical practice resulted from the need to investigate the October 24 incident and ensure patient safety. That determination applies equally to Mezu-

Ndubuisi's retaliation claim. Based on the undisputed facts, Mezu-Ndubuisi's cannot show that her use of FMLA leave was a substantial or motivating factor behind the challenged employment actions.

The timing of Mezu-Ndubuisi's retaliation claim also negates any inference of a causal link between her use of FMLA leave and the challenged employment actions. "When a retaliation claim is based on suspicious timing, the order of events is even more important than the time between them; the theory doesn't work if the retaliatory act precedes the protected activity." *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 676 (7th Cir. 2011). Mezu-Ndubuisi used FMLA leave on October 27, 2020. But the complaints that led to the FPPE and the October 24 incident occurred before then. Menda also decided to refer the October 24 incident to the MPRC before then. So it's implausible that Mezu-Ndubuisi's use of FMLA leave contributed to those initial actions, which spawned the investigations into her clinical practice. In other words, although many of the actions that Mezu-Ndubuisi challenges occurred after she took FMLA leave, the key events that precipitated those actions occurred before then. The court will grant summary judgment to defendants on Mezu-Ndubuisi's FMLA retaliation claim.

### 2. Interference claim

"The FMLA provides that an employer may not 'interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under' the Act." *Ziccarelli v. Dart*, 35 F.4th 1079, 1084 (7th Cir. 2022) (quoting 29 U.S.C. § 2615(a)(1)). The court takes Mezu-Ndubuisi to base her FMLA interference claim on four theories.

First, Mezu-Ndubuisi alleges that, on August 4, 2021, she provided sufficient notice of her intent to take leave to care for her daughter, who had serious health problems. *See* Dkt. 95

at 12. Mezu-Ndubuisi also alleges that Wald, Golden, and McAdams willfully delayed approving her request for more than five days. *See id.* "When an employee requests FMLA leave . . . the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." 29 C.F.R. § 825.300(b)(1).

The undisputed facts contradict the first theory. The human resources department approved Mezu-Ndubuisi's request on August 11, 2021, five business days after she submitted the required documentation. Dkt. 187 ¶ 97; Dkt. 154-3. Mezu-Ndubuisi's first theory fails.

Mezu-Ndubuisi's second theory is based on the one-day delay in extending her FMLA leave to care for her daughter. It's undisputed Chentnik notified Mezu-Ndubuisi that the human resources department had approved her request for an FMLA extension on April 29, 2022, which came six business days after she requested it. The evidence shows that the one-day delay was caused by emails from Wald and Gaspard: (1) asking about discretionary leave; (2) seeking confirmation that Mezu-Ndubuisi had work to do; and (3) attempting to verify her leave balances.

This isn't strong evidence of FMLA interference. But the court will assume for purposes of analyzing the second theory that these email inquiries constitute interference under the FMLA. *But see Petty v. Am. Senior Communities*, 21-cv-538, 2023 WL 4362866, at *5 (S.D. Ind. May 31, 2023) (stating that an employer may interfere with FMLA rights by using leave as a negative factor in employment decisions, or by taking other actions that would dissuade a reasonable employee from exercising her rights under the statute). But, to prevail on an interference claim, Mezu-Ndubuisi must also show that the one-day delay prejudiced her. *See Lutes v. United Trailers, Inc.*, 950 F.3d 359, 368 (7th Cir. 2020). Prejudice is not limited to the

actual denial of benefits; it may include proof that, absent the interference, the employee would have structured her leave differently. *See id.*; *Dart*, 35 F.4th at 1089.

Mezu-Ndubuisi hasn't shown that the one-day delay in extending her FMLA leave prejudiced her. It's undisputed that Mezu-Ndubuisi's leave never lapsed and that she didn't have to return to clinical work, *see* Dkt. 187 ¶ 209, and there's no evidence that she would have structured her leave differently without the email inquiries. *See Katz v. Nw. Orthopaedics & Sports Med. Ltd.*, No. 18-cv-4515, 2020 WL 1986965, at *11 (N.D. Ill. Apr. 27, 2020) (no prejudice on FMLA interference claim when employee received leave she was entitled to and offered no evidence about how she would have structured her leave differently without the interference). Mezu-Ndubuisi's bare statement that the one-day delay caused her "anxiety" and "concern" that she wouldn't be able to care for her daughter does not show prejudice on her FMLA interference claim. *See* Dkt. 158 at 43. No reasonable juror could conclude that the one-day delay to Mezu-Ndubuisi's request for an extension to her FMLA leave prejudiced her. Mezu-Ndubuisi's second theory fails.

Mezu-Ndubuisi's third theory is that, starting in September 2021, Wald and Golden repeatedly harassed her about returning to work, which interfered with her ability to care for her daughter. *See* Dkt. 95 at 12–13. Mezu-Ndubuisi didn't make any argument in her brief in opposition to support this theory, so she has forfeited it. *See* Dkt. 178 at 8; *see also Batson*, 746 F.3d at 833; *Bonte*, 624 F.3d at 466.

But the third theory fails in any case. To prove interference with her FMLA rights, Mezu-Ndubuisi must show that defendants "interfered with, restrained, or denied FMLA benefits to which [s]he was entitled." *Dart*, 35 F.4th at 1089. "Threatening to discipline an employee for seeking or using FMLA leave to which [s]he is entitled clearly qualifies as

interference with FMLA rights." *Id.* at 1090. The "critical question is whether the employer's actions would discourage a reasonable employee from taking FMLA leave." *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 818 n.35 (7th Cir. 2015).

Mezu-Ndubuisi hasn't shown interference or prejudice on the third theory. It's undisputed that, around January 2022, Wald sent Mezu-Ndubuisi "simple inquires and missives" that went unanswered. It's also undisputed that Wald had concerns about whether Mezu-Ndubuisi was performing her research duties as required. Those concerns were reasonable. Mezu-Ndubuisi hasn't disputed that her daughter was in a facility located three hours from Madison, or that she ignored some of Wald's communications. *Cf. Vail v. Raybestos Prods. Co.*, 533 F.3d 904, 909 (7th Cir. 2008) ("[A]n employer can defeat an interference claim by showing, among other things, that the employee did not take leave for the intended purpose."). Mezu-Ndubuisi says Wald and Golden harassed her, but she hasn't described their communications or identified any evidence that these communications involved threats of discipline or comparable employment actions. Mezu-Ndubuisi's leave never lapsed, she didn't have to return to clinical work, and there's no evidence that she would have structed her leave differently without the email inquiries. The third theory fails.

Fourth, Mezu-Ndubuisi alleges that defendants failed to pay her while she was on FMLA leave to care for her daughter. Dkt. 56 ¶ 138. The undisputed facts contradict this theory. Under the terms of her compensation agreement, Mezu-Ndubuisi had to perform eight weeks of clinical duties to receive her full compensation for fiscal year 2022. Mezu-Ndubuisi did not meet that requirement because she was on 50 percent FMLA leave and performed only research work. So, Gaspard notified Mezu-Ndubuisi that the UW Medical Foundation part of her compensation would be reduced accordingly. It was standard practice for the Department

of Pediatrics to withhold 6.6 percent from physicians' total compensation if they didn't meet UW Medical Foundation compensation requirements. No reasonable juror could conclude that defendants interfered with or denied Mezu-Ndubuisi FMLA benefits to which she was entitled during her FMLA leave. The fourth theory fails.

For the reasons explained above, the court will grant summary judgment to defendants on Mezu-Ndubuisi's FMLA interference claim. Because this decision terminates the case, Meriter's motion for Dr. Pritts to appear at trial by videoconference is denied as moot.

## ORDER

IT IS ORDERED:

1. Defendants' motions for summary judgment, Dkt. 144 and Dkt. 164, are GRANTED.

2. Meriter's motion for Dr. Pritts to appear at trial by videoconference, Dkt. 192, is DENIED as moot.

3. The clerk of court is directed to enter judgment and close the case.

Entered November 14, 2025.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge